**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | | |
|---|---|---|
| ALTAMAHA RIVERKEEPER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:14-cv-00044 |
| | ) | |
| RAYONIER INC. AND RAYONIER | ) | |
| PERFORMANCE FIBERS LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

In accordance with the Court's instruction, Defendants Rayonier Inc. and Rayonier Performance Fibers LLC submit this post-hearing brief to address issues relating to the proper interpretation of Rayonier's discharge permit that arose during the Court's September 2, 2014, hearing on Rayonier's motion for summary judgment.

This supplemental brief addresses three basic issues: (1) the significance, if any, of Georgia EPD's absence from this proceeding in the resolution of Rayonier's motion; (2) the implications for the resolution of Rayonier's motion if the Court should determine, after applying the rules of interpretation, that Rayonier's permit is ambiguous; and (3) how the interpretive rules included in O.C.G.A. § 13-2-2 should be applied to Rayonier's permit.

**I.      Georgia EPD's Absence from this Proceeding Does Not Affect the Legal Analysis; ARK Stands in the Shoes of Georgia EPD in this Citizen Suit, and Can Have No Greater Rights than the Government.**

During the September 2, 2014, hearing, the Court noted that Georgia EPD is not a party to this case, and appeared to question how Georgia EPD's absence should factor into the Court's interpretation of Rayonier's permit.  The simple answer to the Court's question is that ARK

stands in the shoes of Georgia EPD in this enforcement case, and the permit must be interpreted as if this were an enforcement action brought by the government.

Plaintiffs bringing suit under the Clean Water Act's citizen-suit provision "are suing as private attorneys general seeking enforcement of a federal law." *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1131 n.5 (11th Cir. 1990). Thus, "citizen plaintiffs 'effectively stand in the shoes of the EPA'" or the state enforcement agencies. *Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 74 (3d Cir. 1990) (quoting *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 209 (2000) (Scalia, J., dissenting) ("A Clean Water Act plaintiff pursuing civil penalties acts as a self-appointed mini-EPA."). And as such, citizen plaintiffs can enjoy no greater rights than the government would have if it were the plaintiff in this enforcement action.[1]  *See Sierra Club*, 834 F.2d at 1524 n.5.

In this case, ARK stands in the shoes of Georgia EPD, which both drafted and executed Rayonier's permit. That being so, interpretive principles that would be applied against Georgia EPD if it were the plaintiff in this enforcement case must be applied against ARK as well. Any

---

[1] Because Congress intended for the Clean Water Act to be enforced primarily by the government, citizen suits are "meant to supplement rather than supplant governmental action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987). Accordingly, the rights of citizen plaintiffs are actually more limited than those of the government. They are required to comply with notice and waiting periods that are inapplicable to the government. *See* 33 U.S.C. § 1365(b). And they are not entitled to the benefit of certain rules intended to protect the government in environmental enforcement cases. This is because courts have recognized that, although citizens "may be acting as private attorneys general, they do not represent the public at large in the same way the government does when it brings suit to enforce the statute." *Nat'l Parks & Conservation Ass'n, Inc. v. TVA*, 502 F.3d 1316, 1327 (11th Cir. 2007) (declining to "expand[] the governmental exception to preclude application of the concurrent remedy doctrine in the instant suit, which was filed by private parties where the government has declined to act").

other result would improperly "accord citizen plaintiffs enforcement power *greater than* that of federal and state agencies," *id.* (emphasis in original), an outcome that Congress plainly did not intend when it authorized "supplemental" citizen suits under the Clean Water Act.

## II.   The Court Should Interpret the Permit to Avoid Ambiguity and Uphold the Permit In Every Part.

During the September 2, 2014, hearing, the Court asked two separate but related questions.  First, the Court asked how it should proceed if it were to conclude that certain interpretive principles weigh in favor of Rayonier's interpretation of the permit, while other interpretive principles weigh in favor of ARK's interpretation.  Second, the Court asked whether ambiguity in Rayonier's permit would necessarily make summary judgment inappropriate, thereby requiring a trial to ascertain Georgia EPD's intent.

The Court's first question is addressed in detail in Part III of this brief.  The short answer, however, is that a potential conflict resulting from the application of the various rules of interpretation is not dispositive as to whether the permit is ambiguous because "[n]o canon of interpretation is absolute [and] [e]ach may be overcome by the strength of differing principles that point in other directions."  *Kwok v. Delta Air Lines Inc.*, 994 F. Supp. 2d 1290, 1295 (N.D. Ga. 2014) (quoting *Estate of Pitts v. City of Atlanta*, 746 S.E.2d 698, 702 (Ga. Ct. App. 2013)) (alterations in original).

The answer to the Court's second question raises a more fundamental issue:  How should ambiguity regarding the permit's substantive requirements be resolved given that this is a citizen suit to enforce alleged violations of Rayonier's permit, and thus the Clean Water Act?  This issue is addressed below.

A.      **Ambiguous permit provisions cannot be enforced because due process requires "fair notice" of prohibited conduct.**

As Rayonier explained in its opening brief, "violations of a permit condition constitute a violation of the Clean Water Act that can subject the permittee to civil penalties of up to $37,500 per day and even criminal penalties." (Rayonier Brief at 29) (citing 33 U.S.C. § 1319; 40 C.F.R. § 19.4).  Accordingly, "fairness and due process require Georgia EPD to use clear and unambiguous language to establish enforceable permit conditions." (*Id.*)

Courts uniformly recognize that, "[w]here the imposition of penal sanctions is at issue," due process mandates that an agency provide regulated parties "fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.); *Georgia Pacific Corp. v. Occupational Safety & Health Review Comm'n*, 25 F.3d 999, 1005 (11th Cir. 1994) (same).  Indeed, the Supreme Court has explained that "ambiguous regulations" may not be invoked "to impose potentially massive liability … for conduct that occurred well before [a definitive] interpretation was announced," explaining that adopting the agency's interpretation in that circumstance "would seriously undermine the principle" that regulated parties are entitled to "fair warning" and "would result in precisely the kind of 'unfair surprise' against which our cases have long warned." *Christopher v. SmithKline Beecham Corp.*, --- U.S. ---, 132 S. Ct. 2156, 2167 (2012).

The former Fifth Circuit's decision in *Diamond Roofing Co. v. OSHRC,* 528 F.2d 645 (5th Cir. 1976), which Justice Scalia quoted at length in *Gates*, is one of the seminal cases on this point.  In that case, the former Fifth Circuit explained:

> The respondents contend that the regulations should be liberally construed to give broad coverage because of the intent of Congress to provide safe and healthful working conditions for employees. An employer, however, is entitled to fair notice in dealing with his government. Like other statutes and regulations which allow monetary penalties against those who violate them, an occupational safety

> and health standard must give an employer fair warning of the conduct it prohibits or requires....
>
> If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express.... [T]he [agency] as enforcer of the Act has the responsibility to state with ascertainable certainty what is meant by the standards [it] has promulgated.

*Gates*, 790 F.2d at 156 (quoting *Diamond Roofing*, 528 F.2d at 649).

The Eleventh Circuit applied this principle in *Georgia Pacific* and vacated penalties because the regulatory requirement being enforced was vague and ambiguous, explaining that the Constitution prohibits the imposition of fines and penalties where a statutory or regulatory prohibition is "'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'"  *Georgia Pacific*, 25 F.3d at 1005 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  The Eleventh Circuit further explained that it was the agency, and not the regulated party, that bore responsibility for the ambiguous and unenforceable requirement, stating that it was the agency's responsibility to provide "sufficient guidance" to those who would enforce the standards, as well as regulated parties "who are subject to civil penalties," and "those courts who may be charged to interpret and apply the standards."  *Id.* at 1005-06.  Thus, when a regulatory requirement is vague or ambiguous, the agency should impose a clearer standard, "rather than forcing the judiciary to press the limits of judicial construction."  *Id.* at 1006.

The same analysis that applies to the enforcement of ambiguous regulations also applies to the enforcement of ambiguous conditions in Clean Water Act discharge permits.  Although NPDES permits are interpreted using principles of contracts, "[a]n NPDES permit is not a contract," but rather is effectively "a legally enforceable rule drafted by a regulatory agency." *California Pub. Interest Research Grp. v. Shell Oil Co.*, 840 F. Supp. 712, 716 (N.D. Cal. 1993).

Thus, courts may consider in an enforcement action whether a permit condition is unconstitutionally vague, *see, e.g.*, *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993), and may not adopt an interpretation of an ambiguous permit that fails to provide the discharger with fair notice of what is prohibited, *see Christopher*, 132 S. Ct. at 2167; *Georgia Pacific*, 25 F.3d at 1004 (explaining that "[t]o pass constitutional muster a regulation must provide a fair and reasonable warning of what it prohibited," and that courts should reject an interpretation that "is either unconstitutionally vague as applied or unreasonable given the regulated activity"); *Diamond Roofing*, 528 F.2d at 649 ("a regulation cannot be construed to mean what an agency intended but did not adequately express"). This is true notwithstanding the protective purposes of the statute at issue. *See id.* (rejecting argument that an ambiguous requirement should be "liberally construed" in an enforcement action based on the protective purposes of the underlying statute).

Not surprisingly, US EPA's Environmental Appeals Board,[2] which sits in review of administrative enforcement actions brought by US EPA under the Clean Water Act, has applied these principles to vacate penalties imposed for violations of an ambiguous NPDES discharge permit. The decision in *In re: Advanced Electronics*, 2002 WL 393655 (E.P.A. Mar. 11, 2002), is instructive. There, US EPA initiated an enforcement action against a permittee for alleged violations of its permit monitoring requirements. The permit required the permittee to test its discharge "'monthly and submit the results on the semi annual report form.'" *Id*. at *17 (quoting

---

[2] "The Appeals Board is the final Agency decisionmaker on administrative appeals under all major environmental statutes that the Agency administers. It is an impartial body independent of all Agency components outside the immediate Office of the Administrator. The Board typically sits in panels of three judges and makes decisions by majority vote." US EPA, Environmental Appeals Board, http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf (last visited Sept. 9, 2014).

the permit).  The permittee interpreted this provision as requiring monthly testing that is reported on a semi-annual basis.  US EPA, however, interpreted this provision as requiring the permittee to report testing results on a monthly basis using a form called the "semi annual report form."  *Id*. US EPA brought an administrative enforcement action for violation of this permit provision, and found the permittee liable for 18 violations of this monitoring requirement.

The Environmental Appeals Board reversed, finding "the Permit language sufficiently ambiguous that imposition of a penalty for the [monitoring] violations would be manifestly unfair."  *Id*.  In this regard, the Environmental Appeals Board explained that the permittee could not be held liable for the violations claimed by US EPA because "the ambiguous Permit language" did not give the permittee "fair notice of [US EPA's] interpretation of the Permit's monitoring requirements," and accordingly vacated the penalties for these alleged violations.  *Id*. at *18.

**B.     ARK's interpretation must be rejected because it would render provisions of the permit unenforceable.**

This case presents two very different interpretations of Rayonier's permit.  Under ARK's interpretation, Rayonier's permit incorporates Georgia's narrative standards for color, odor, and turbidity, such that an alleged violation of the narrative standards constitutes a violation of the permit and thus the Clean Water Act.  Under Rayonier's interpretation, the permit does not include the narrative standards as permit conditions, such that the Clean Water Act's permit shield provides an absolute defense to claims alleging violations of the narrative standards.

If this Court were to find that Rayonier's permit is ambiguous on this point, that alone would be sufficient grounds to hold as a matter of law that Rayonier cannot be held liable for

violating the provisions of its permit at issue in this case.[3]  Like a contract term, a permit

provision is "ambiguous when it is reasonably susceptible to more than one interpretation."

*Stewart v. KHD Deutz of Am.*, 980 F.2d 698, 702 (11th Cir. 1993) (applying both federal and

Georgia law).  But if the permit is ambiguous because it is susceptible to more than one

reasonable interpretation—that is, if it can reasonably be interpreted both as incorporating the

narrative standards and not—then the permit would be unconstitutionally vague in an action to

enforce provisions of the permit relating to the narrative standards.  Those permit provisions

could not possibly provide fair notice of what they prohibit, and any judgment imposing

penalties for their violation would necessarily be unconstitutional under the Due Process Clause

of the Fifth or Fourteenth Amendments.[4]  *See Georgia Pacific*, 25 F.3d at 1005.

---

[3] While parties have, from time to time, asserted that Georgia EPD's form cover page incorporates Georgia's narrative standards, this is not a reasonable interpretation of Rayonier's permit for the reasons stated in Rayonier's briefs—most notably, that the language relied upon is not included within "Parts I, II and III" of the permit.  But there is no evidence in the record that, prior to this case, either Georgia EPD or ARK has asserted that the permit's "Biomonitoring and Toxicity Reduction Requirements" section incorporates Georgia's narrative standards for color, odor and turbidity.  In response to Rayonier's motion, the only evidence ARK produced was the document authored by Ms. Shahbazaz, a Georgia EPD employee, attached to a letter to ARK's attorneys in a wholly unrelated matter to which Rayonier was not a party.  However, as Rayonier has explained, this document pertains to a permit for a different facility, and cannot be referring to the "Biomonitoring and Toxicity Reduction Requirements" because this provision, while boilerplate, does not appear in "all" Georgia EPD permits.  Indeed, even ARK's 60-day notice letter relies solely on the permit's cover page and *Coats American*.  (Doc. 1-1 at 2.)

[4] Notably, even ARK cannot decide what the permit means and how, precisely, the permit should be interpreted.  In its 2001 challenge to the permit, ARK asserted that the permit does not incorporate the narrative standards.  Now, as discussed below, ARK offers two alternative (and inherently contradictory) theories of incorporation—one based on the permit's cover page and another based on the permit's "Biomonitoring and Toxicity Reduction Requirements" provision.  ARK's inability to settle on what the permit means "necessarily implicates the adequacy of notice" to Rayonier.  *Georgia Pacific*, 25 F.3d at 1005 (finding a regulation unconstitutionally vague, pointing out that counsel for the agency offered various interpretations of the regulation at issue).

The Court can and should avoid this quandary—and uphold the validity of all terms of the permit—by applying black-letter principles of contract interpretation to resolve any ambiguity concerning the enforceability of Georgia's narrative standards in favor of Rayonier. As ARK stated in its Response Brief, one of the central rules of contract interpretation is that "contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." *Walsch v. Schlecht*, 429 U.S. 401, 408 (1977); *Moore v. Hughey*, 212 S.E.2d 503, 505 (Ga. Ct. App. 1975) ("An agreement capable of an interpretation which will make it valid or legal will be given such interpretation if the agreement is ambiguous.") (internal quotations omitted); (ARK Response (Doc. 29) at 24-25).  Only Rayonier's interpretation is consistent with this interpretive principle.  And because courts are "to give the contract a reasonable construction that will uphold the agreement rather than a construction that will render the agreement meaningless and ineffective," *Shepherd v. Greer, Klosic & Daugherty*, 750 S.E.2d 463, 467 (Ga. Ct. App. 2013), this rule of interpretation conclusively resolves any ambiguity in the permit.  Summary judgment on ARK's claims is accordingly proper.

## III.     The Factors in O.C.G.A. § 13-2-2 Support Rayonier's Interpretation.

During the September 2, 2014, hearing, the Court asked how it should proceed if it were to conclude that certain interpretive principles weigh in favor of Rayonier's interpretation of the permit, while other interpretive principles weigh in favor of ARK's interpretation.  In particular, the Court asked whether conflicting results from applying the various interpretive principles would mean that Rayonier's permit is necessarily ambiguous, making summary judgment inappropriate because there is an issue of fact for trial.

In answer to the Court's question, the fact that certain interpretive principles may cut in opposite directions is not dispositive.  Rather, as explained in greater detail below, "[n]o canon

of interpretation is absolute [and] [e]ach may be overcome by the strength of differing principles that point in other directions." *Kwok*, 994 F. Supp. 2d at 1295 (quoting *Estate of Pitts*, 746 S.E.2d at 702) (alterations in original).  Thus, even if there is a tension between the rules of construction, the Court may weigh the strength of the competing rules in determining the correct interpretation of Rayonier's permit.  *See In re Estate of McKitrick*, 757 S.E.2d 295, 298-99 (Ga. Ct. App. 2014) (resolving an ambiguity in a fee agreement by weighing the strength of two rules of construction which supported competing interpretations).  A conflict between the rules of construction does not necessarily require consideration of extrinsic evidence or create an issue of material fact.

Turning to the rules themselves, the Court need not apply each of the statutory factors in O.C.G.A. § 13-2-2 because, as explained above, ambiguity concerning what the permit prohibits or requires should be resolved in Rayonier's favor to uphold its validity.  Nevertheless, application of the statutory factors in O.C.G.A. § 13-2-2—and the non-statutory factors addressed in Rayonier's briefs—similarly resolves any ambiguity in the permit, and demonstrates that the narrative standards are not conditions of the permit.

### A.   The Court may weigh the strength of any conflicting interpretive rules to determine the parties' intent.

In determining the intent of contracting parties, the Court first must determine whether the text of a contract is ambiguous.  *City of Baldwin v. Woodard & Curran, Inc.*, 743 S.E.2d 381, 389 (Ga. 2013).  If the Court determines that it is, the Court then applies both statutory and non-statutory rules of construction in an attempt to resolve the ambiguity.  *Id.*; O.C.G.A. § 13-2-2.  Only if the rules of construction fail to resolve the ambiguity may the Court consider extrinsic evidence.  *Roca Properties, LLC v. Dance Hotlanta, Inc.*, 761 S.E.2d 105, 111-12 (Ga. Ct. App. 2014).

As the Court suggested during the hearing, it is possible that application of these rules of construction might support varying interpretations of the permit.  If that should occur, however, the Court is not required to simply declare the permit ambiguous and set the matter down for trial.  To the contrary, the Court should weigh the strength of the various interpretive principles and resolve the ambiguity by giving more weight to certain principles rather than others.

As the Georgia courts have explained, "'[n]o canon of interpretation is absolute.  Each may be overcome by the strength of differing principles that point in other directions.'"  *Estate of Pitts*, 746 S.E.2d at 702 (quoting Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 59 (West 2012)); *Kwok*, 994 F. Supp. 2d at 1295 (same).  The "cardinal rule of construction" in Georgia "is to ascertain the intention of the parties,"  and where "sufficient words are used to arrive at the intention," the Georgia courts are bound to enforce it "irrespective of all technical or arbitrary rules of construction."  O.C.G.A. § 13-2-3.  Thus, when there is a conflict between the rules of construction, the Court may weigh the strength of the competing rules in determining the parties' intent.  *See In re Estate of McKitrick*, 757 S.E.2d at 298-99 (Ga. Ct. App. 2014).  And if that intent can reasonably be ascertained, the Court may apply the rules of interpretation that support it to resolve the ambiguity without resort to extrinsic evidence.

In weighing the rules of construction under Georgia law, some rules are given priority over others.  As discussed above, the "cardinal rule" of construction is to determine the intent of the parties, which trumps all other rules of construction.  O.C.G.A. § 13-2-3.  Additionally, the rule requiring the contract to be interpreted as a whole, O.C.G.A. § 13-2-2(4), is favored over construing a contract against the drafter, O.C.G.A. § 13-2-2(5).  *See Bratton v. Am. Nat. Ins. Co.*, No. C82-1156A, 1983 WL 518 (N.D. Ga. June 24, 1983).

11

Beyond these two instances, Georgia case law provides little guidance in how the rules should be weighed against one another.  *Cf. Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 753 (Fed. Cir. 1999) ("Where canons of contract interpretation point to different interpretations, resolution of the conflict is necessarily left to the facts of the particular case.").  While the facts of one case may allow the Court to resolve an ambiguity despite competing rules, *see e.g.*, *In re Estate of McKitrick*, 757 S.E.2d at 298-99, under other facts the Court may still have to consult extrinsic evidence after weighing the applicable rules, *see e.g.*, *DJ Mortg., LLC v. Synovus Bank*, 750 S.E.2d 797, 805 (Ga. Ct. App. 2013).  Regardless of the factual circumstances, however, the Court should first attempt to resolve any ambiguity by weighing "the strength of the differing principles" of construction—and considering their specific application in the context of an enforcement action—before resorting to extrinsic evidence.

Here, the cumulative weight of the various interpretive principles leads to only one conclusion:  The narrative standards are not a condition of  Rayonier's permit.

**B.       The rules of construction support Rayonier's interpretation.**

**1.       ARK's interpretation fails to uphold the permit in every part.**

Under O.C.G.A. § 13-2-2(4), the interpretation that upholds the contract in every part is preferred and the Court should consider the entire contract in determining the parties' intent. *Garrett v. S. Health Corp. of Ellijay*, 739 S.E.2d 661, 667-68 (2013) ("[I]t is a well-established rule of contract construction that a court should avoid an interpretation of a contract which renders any of its terms meaningless or mere surplusage.").  As discussed above, ARK's interpretation would render certain permit terms unenforceable on grounds of vagueness and must be rejected for that reason alone.

12

But even putting that issue aside, ARK's interpretation would also render provisions of the permit superfluous.  The permit includes a "Permit Modification" section, which allows EPD to modify the permit if there is a violation of a permit condition.  (Doc. 20-2 at 13, Part II.B.4.)  The permit also includes a "Water Quality Standards" section that allows EPD to modify the permit if it determines "that the effluent limitations specified herein fail to achieve the applicable State water quality standards."  (Doc. 20-2 at 14, Part II.B.8.)  This latter section would be entirely redundant under ARK's interpretation.  If, as ARK claims, the water quality standards are already enforceable permit conditions, a violation of the standards would allow EPD to modify the permit under the "Permit Modification" section and the "Water Quality Standards" section would serve no purpose.  The interpretation that upholds both of these provisions is that EPD did not include the water quality standards as enforceable permit conditions but reserved the right to modify the permit if the discharge failed to meet the narrative standards.  ARK's interpretation should be rejected because it fails to give the entire permit effect.

Indeed, the interpretation that ARK offers is itself inherently contradictory, such that ARK's interpretation cannot possibly give effect to the entire permit.  On the one hand, ARK says that the permit's cover page incorporates Georgia's narrative standards; on the other hand, ARK says that the permit's "Biomonitoring and Toxicity Reduction Requirements" section also incorporates Georgia's narrative standards.  In other words, ARK's position is that the permit contains two separate provisions that both incorporate the same standards.

ARK's interpretation must be rejected under O.C.G.A. § 13-2-2(4) because, if ARK were correct, one provision or the other would be surplusage.  But "none of the words [in a contract] are to be considered as redundant," *Woodbery v. Atlas Realty Co.*, 98 S.E. 472, 474 (Ga. 1919), and Georgia EPD "would not have used two different terms in two [different] paragraphs to

describe the same thing," *Tyson v. McPhail Properties, Inc.*, 478 S.E.2d 467, 472 (Ga. Ct. App. 1996).  Thus, ARK's proffered interpretation must be rejected because it would fail to uphold the permit in its entirety.  *See Garrett*, 739 S.E.2d at 667-68 (Ga. Ct. App. 2013) (rejecting an interpretation that would give two different terms "interchangeable" meaning).

**2.     The permit must be construed against ARK, which stands in the shoes of Georgia EPD.**

O.C.G.A. § 13-2-2(5) states:  "If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred."  The Georgia Supreme Court has interpreted this provision to mean that a contract should "be construed against the preparer and in favor of the non-preparer."  *Hertz Equip. Rental Corp. v. Evans*, 397 S.E.2d 692, 694 (Ga. 1990); *see also Reichman v. S. Ear, Nose & Throat Surgeons, P.C.*, 598 S.E.2d 12, 16 (Ga. Ct. App. 2004) ("Pursuant to OCGA § 13-2-2(5) as judicially interpreted, where the construction of a contract is doubtful, the construction that goes most strongly against the drafter of the agreement is to be preferred.").

This factor weighs strongly in Rayonier's favor.  Georgia EPD drafted Rayonier's permit.  And the Director of Georgia EPD executed the permit on behalf of the agency.  As such, the Court must construe the permit in favor of Rayonier and against ARK, which stands in the shoes of Georgia EPD in this enforcement action.  Indeed, this rule takes on special—even Constitutional—significance given the nature of this enforcement action and the penalties at issue in this case.  As explained above, principles of due process require that permittees be given fair warning of what the permit requires.  Construing an ambiguous permit against the agency that drafted it is consistent with the overriding principle that permittees cannot be subjected to civil fines and even criminal penalties when the permit is "reasonably susceptible to more than one interpretation," *Stewart*, 980 F.2d at 702, and people "'of common intelligence must

14

necessarily guess at its meaning.'"  *Georgia Pacific*, 25 F.3d at 1005 (quoting *Connally*, 269

U.S. at 391).  As the Former Fifth Circuit has stated, an agency "'as enforcer of the Act has the

responsibility to state with ascertainable certainty'" what it intends to prohibit.  *Gates*, 790 F.2d

at 156 (quoting *Diamond Roofing*, 528 F.2d at 649).  And as such, a permit "'cannot be

construed to mean what an agency intended but did not adequately express.'"  *Id.*

      In addition to providing that the permit should be construed against the drafter, O.C.G.A.

§ 13-2-2(5) also provides that construing the contract against the party "undertaking the

obligation" is generally preferred.  This provision, however, has no application to this case.  As

explained above, while a discharge permit is interpreted as if it were a contract, "[a]n NPDES

permit is not a contract; rather it is a legally enforceable rule drafted by a regulatory agency."

*California Pub. Interest Research Grp.*, 840 F. Supp. at 716.  Unlike a contract, the permit does

not create mutual obligations between Rayonier and EPD; the permit authorizes the discharge of

treated wastewater subject to certain restrictions and conditions.  Accepting a permit therefore

does not create a contractual obligation on the part of Rayonier within the meaning of this

section.  In contrast, in the few cases where Georgia courts have construed a contract against the

party "undertaking the obligation," there was an explicit obligation to perform an affirmative act

for the benefit of the other party to the contract.  *See, e.g.*, *Woody's Steaks, LLC v. Pastoria*, 584

S.E.2d 41, 44 (Ga. Ct. App. 2003) (obligation to open a business by a certain date); *Town Ctr.

Associates v. Workman*, 487 S.E.2d 624, 626 (Ga. Ct. App. 1997) (obligation to make guaranty

payments); *CareAmercia, Inc. v. S. Care Corp.*, 494 S.E.2d 720, 723 (Ga. Ct. App. 1997)

(obligation to pay note).  Because the permit does not create any such obligations, the

"undertaking the obligation" provision simply does not apply.

More fundamentally, application of this rule in an enforcement action would amount to a rule that an ambiguous permit should be interpreted against the permittee.  But this would run directly counter to the principles of due process outlined above, and it should be rejected for this reason as well.  *Cf. Haley v. State*, 712 S.E.2d 838, 843 (Ga. 2011) ("even if this were only a reasonable narrowing construction of the statute, we would adopt it to avoid the serious constitutional concerns raised by the broader construction").

### 3. Interpreting the reference to 391-3-6-.03(5) as limited to the toxic standards does not require the Court to supply additional words.

"In extreme cases of ambiguity," the statutory rules of construction permit the Court to supply words.  O.C.G.A. § 13-2-2(6).  This rule also has no application in this case.  Construing the reference to 391-3-6-.03(5) as incorporating only the toxicity standards does not require the addition of any words.  Rather, as discussed elsewhere, it results from construing the reference narrowly and in a manner that is consistent with the provision's heading and its context, and that upholds the permit in its entirety.

Georgia EPD's failure to provide the specific and more precise citation for the toxic standards that are found in subsection .03(5)(e) rather than in .03(5) is akin to a scrivener's error.  Such typographical or clerical errors "do not defeat the clear intentions of the parties when the contract is interpreted in its entirety, and therefore do not render contracts ambiguous."  *Begner*, 428 F.3d at 1007; *see also Coker v. Coker*, 595 S.E.2d 556, 557 n.2 (Ga. Ct. App. 2004) ("The manifest intention of the parties controls over such scrivener's error and will be given effect.").  Any error in not sufficiently specifying where the toxicity standards are found cannot defeat Georgia EPD's clear intent to incorporate only the toxicity standards into the permit as enforceable conditions.  *Begner*, 428 F.3d at 1007.

16

**C.** **Non-statutory factors strongly support Rayonier's interpretation as well.**

As noted above, the factors in O.C.G.A. § 13-2-2 are not exclusive, and the Court may utilize interpretive principles not included in the code section in construing the permit. *See* O.C.G.A. § 13-2-2 ("The following rules, *among others*, shall be used in arriving at the true interpretation of contracts") (emphasis added). In its prior briefs, Rayonier identified numerous non-statutory principles of contract construction employed by Georgia courts that all support Rayonier's interpretation of the permit. These interpretive principles include:

1. Under the permit's plain text, the cover page cannot incorporate Georgia's narrative standards because the language ARK relies upon is not included within the conditions "set forth in Parts I, II and III" of the permit. (Rayonier Brief at 19-21; Rayonier Reply (Doc. 32) at 2, 10-11.)

2. The reference to Georgia Rule 391-3-6-.03(5) in the permit's "Biomonitoring and Toxicity Reduction Requirements" section must be construed in light of this heading. *See Office Depot, Inc. v. District at Howell Mill, LLC*, 710 S.E.2d 685, 689 (Ga. Ct. App. 2011); (Rayonier Brief at 24; Rayonier Reply at 16).

3. The reference to Georgia Rule 391-3-6-.03(5) in the permit's "Biomonitoring and Toxicity Reduction Requirements" section must be interpreted in consideration of its context and its placement between two explicit references to toxicity standards. *See, e.g.*, *Holmes v. Clear Channel Outdoor, Inc.*, 644 S.E.2d 311, 314 (Ga. Ct. App. 2007) (interpreting a provision within the context of its surrounding language); *Witty v. McNeal Agency, Inc.* 521 S.E.2d 619, 625 (Ga. Ct. App. 1999) (reading a "broad" contract term in context and limiting it to the "same kind or category" as surrounding contract terms); (Rayonier Brief at 24-25; Rayonier Reply at 16-17).

4. The reference to Georgia Rule 391-3-6-.03(5) in the permit's "Biomonitoring and Toxicity Reduction Requirements" section must be interpreted in light of the fact that ARK's

17

interpretation would lead to the absurd result of incorporating the general standards in Georgia Rule 391-3-6-.03(5), while failing to incorporate the specific water quality standards in Georgia Rule 391-3-6-.03(6).  *See Office Depot*, 710 S.E.2d at 689 ("A contract, however, must be read reasonably, in its entirety, and in a way that does not lead to an absurd result."); (Rayonier Brief at 26-27; Rayonier Reply at 16).

Rayonier believes each of these points has been appropriately addressed in the prior briefs to this Court, and it has no desire to reargue them here.  It simply notes that these principles of construction overwhelmingly confirm Rayonier's interpretation of the permit.  They should be considered along with any of the O.C.G.A. § 13-2-2 factors that the Court deems relevant, as it weighs the "strength of differing principles" of interpretation in resolving any ambiguity in the permit.

## CONCLUSION

For the reasons stated above and in Rayonier's previously filed briefs, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted this, 12th day of September, 2014.

<table>
<tr>
<td>

**/s/  Patricia T. Barmeyer, Esq.**
PATRICIA T. BARMEYER
  Georgia State Bar No. 038500
  Email: pbarmeyer@kslaw.com
JOHN L. FORTUNA
  Georgia State Bar No. 435149
  Email: jfortuna@kslaw.com
  *Admitted pro hac vice*
STEPHEN A. McCULLERS
  Georgia State Bar No. 243847
  Email: smccullers@kslaw.com
  *Admitted pro hac vice*

KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Telephone:  (404)572-4600

</td>
<td>

**/s/  James B. Durham, Esq.**
JAMES B. DURHAM
  Georgia State Bar No. 235526
  Email: jdurham@durhamfirm.com

DURHAM & RIZZI, P.C.
Post Office Box 2177
Brunswick, Georgia  31521-2177
Telephone:  (912)264-1800

*Attorneys for Defendants*

</td>
</tr>
</table>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2014, I electronically filed the foregoing SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record registered for e-mail service on the CM/ECF system.

**/s/  John L. Fortuna, Esq.**
JOHN L. FORTUNA
 Georgia State Bar No. 435149
 Email: jfortuna@kslaw.com
 *Admitted pro hac vice*

***Attorney for Defendants***