# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

ALTAMAHA RIVERKEEPER, INC.,

    Plaintiff,

    v.

RAYONIER, INC, and RAYONIER
PERFORMANCE FIBERS, LLC.

    Defendants.

CV 214-44

## ORDER

On its face, this case is about the Clean Water Act. But the heart of the matter is strictly a question of contract law: does Defendant Rayonier Inc.'s NPDES permit, which allows it to discharge wastewater into the Altamaha River under certain conditions, include Georgia's water quality standards for color, odor, and turbidity as some of those conditions? This Court finds that it does not, as a matter of law, and **GRANTS** Defendants' motion for summary judgment (Dkt. no. 19) as to Plaintiff Altamaha Rivkerkeeper's federal claims (Counts I, II, V (Injunctive Relief), and VII). The Riverkeeper's state law claims (Counts III, IV, V (Public Nuisance) and VI) are

AO 72A
(Rev. 8/82)

**DISMISSED** without prejudice for lack of supplemental jurisdiction.

## FACTUAL BACKGROUND

Defendants Rayonier Inc. and Rayonier Performance Fibers, LLC (together, "Rayonier"), operate a pulp mill in Jesup, Georgia that produces specialty cellulose products from wood chips. As part of its operations, the Rayonier mill discharges about 50 to 60 million gallons of wastewater into the Altamaha River every day. See Dkt. no. 1, Pl.'s Compl. ¶ 30; Dkt. no. 10, Rayonier Performance Fibers' Ans., ¶30. Rayonier has a permit, issued by the Georgia Environmental Protection Division ("Georgia EPD") in accordance with the National Pollution Discharge Elimination System ("NPDES"), to discharge wastewater into the Altamaha River under certain conditions. Dkt. no. 20-2, Permit No. GA0003620 ("Permit").

The Altamaha Riverkeeper ("Riverkeeper") is a 501(c)(3) non-profit environmental organization that seeks to protect and restore the habitat, water quality, and flow of the Altamaha River from its headwaters in the Piedmont to its terminus at the Atlantic Ocean near Darien, Georgia. Dkt. no. 29-1, Sheppard Decl., ¶ 3. To achieve its mission, the Riverkeeper monitors wastewater discharges to ensure compliance with permits and water quality standards, comments on pending permits, and, as it has done here, engages in litigation when it believes the

AO 72A
(Rev. 8/82)

Georgia EPD has failed to enforce state and federal water quality standards against those who discharge wastewater or pollutants into the Altamaha River.

This litigation stems from what the Riverkeeper believes to be Georgia EPD's failure to enforce state and federal water quality standards against Rayonier for the wastewater discharged from its pulp mill. Specifically, the Riverkeeper complains that Rayonier's wastewater discharge is so dirty and fetid that it violates Georgia's water quality standards for color, odor, and turbidity. Dkt. no. 29, Pl's Response, p. 8. In fact, the Riverkeeper alleges that Rayonier's wastewater is so much darker than the Altamaha's waters that satellite images of the Altamaha River show a distinctly dark plume originating at Rayonier's discharge point and continuing far downstream. Id. at p. 5. The wastewater discharge is so malodorous, according to the Riverkeeper, that "[w]ords are not adequate to convey the smell." Id. at 6.

The Riverkeeper claims that Rayonier's discharge has such a negative impact on the Altamaha River's water quality that it violates what are known as Georgia's narrative water quality standards, which require that "[a]ll waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable

conditions which interfere with legitimate water uses." Ga. Comp. R. & Regs. 391-3-6-.03(5)(c).

Indeed, in a recent consent order, the Georgia EPD itself concluded that

> the aesthetic impact of the Facility's discharge has the reasonable potential to violate the Narrative Water Quality Standards because it has the reasonable potential to produce turbidity or other objectionable conditions that interfere with legitimate water quality uses of the Altamaha River and it has the reasonable potential to cause turbidity that results in a substantial visual contrast in the Altamaha River due to man-made activity.

Dkt. no. 21-27, Consent Order EPD-WQ-4837, at pp. 4-5.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

<u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. <u>Id.</u> at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. <u>Anderson</u>, 477 U.S. at 257.

## DISCUSSION

The Riverkeeper alleges that Rayonier is discharging its wastewater into the Altamaha River in violation of its NPDES Permit, and thus in violation of the Clean Water Act. For the Riverkeeper to have a cause of action under the CWA, compliance with the state effluent standards that the Riverkeeper alleges Rayonier is violating must be a condition of its NPDES permit.

## I.    The Clean Water Act

The purpose of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA makes it illegal to introduce pollutants from any point source into the navigable waters of the United States without a permit. <u>Id.</u> at §§ 1311(a),

1342. Section 402 of the CWA establishes the NPDES system, which issues the type of permit in question here. 33 U.S.C. § 1342. The EPA Administrator has initial authority to issue NPDES permits, but the act allows the EPA to delegate this permitting authority to the states. Id. at § 1342(a), (b). In Georgia, the Georgia Department of Natural Resources, Environmental Protection Division has authority to issue NPDES permits.

Citizens may bring civil suits on their own behalf against persons allegedly violating conditions of an NPDES permit. 33 U.S.C. § 1365(a), (f)(6). However, where a permittee discharges pollutants in compliance with the terms of its NPDES permit, the permit "shields" the permittee from liability under the CWA. 33 U.S.C. § 1342(k). Section 1342(k)'s permit shield "affords an absolute defense to a permit holder that complies with the conditions of its permit against citizen suits" seeking to enforce certain provisions of the CWA. Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc., 734 F.3d 1297, 1303 (11th Cir. 2013).

Citizen plaintiffs who bring a suit under § 1365 are suing as "private attorneys general seeking enforcement of a federal law." Atl. States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1131 n.5 (11th Cir. 1990). These plaintiffs "effectively stand in the shoes of the EPA." Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.,

AO 72A
(Rev. 8/82)

913 F.2d 64, 74 (3rd Cir. 1990) (quoting <u>Sierra Club v. Chevron</u> <u>U.S.A., Inc.</u>, 834 F.2d 1517, 1522 (9th Cir. 1987)). Likewise, for purposes of this civil action, the Riverkeeper stands in the shoes of Georgia EPD.

Thus, to resolve the parties' contentions, the Court must interpret the language of the Permit Georgia EPD issued to Rayonier. While NPDES permits themselves are not contracts, they are interpreted as if they were. <u>Natural Res. Def. Council, Inc.</u> <u>v. Cnty. of Los Angeles</u>, 725 F.3d 1194, 1204 (9th Cir. 2013). "If the language of the permit, considered in light of the structure of the permit as a whole, is plain and capable of legal construction, the language alone must determine the permit's meaning." <u>Id.</u> at 1204-05 (quoting <u>Piney Run Pres. Ass'n</u> <u>v. Comm'rs of Carrol Cnty.</u>, 268 F.3d 255, 270 (4th Cir. 2001)). If the language of the permit is ambiguous, courts may consider extrinsic evidence to interpret its terms. <u>Id.</u> at 1205. However, under Georgia law and Eleventh Circuit precedent, courts turn to extrinsic evidence to explain ambiguity in a contract "only when a contract remains ambiguous after the pertinent rules of construction have been applied." <u>Claussen v. Aetna Cas. & Sur.</u> <u>Co.</u>, 888 F.2d 747, 749 (11th Cir. 1989) (citing <u>Holcomb v. Word</u>, 238 S.E.2d 915, 916 (Ga. 1977)).

## II. **Applicable Principles of Contract Interpretation**

"Federal courts use federal common law to evaluate government contracts. When determining what particular doctrine to apply in a suit, however, the court will often select a rule of state law." Begner v. United States, 428 F.3d 998, 1004-05 (11th Cir. 2005) (citations, quotations, and editorial marks omitted). Here, the Court will rely in part on Georgia contract law because the events in question occurred in Georgia, see id. at 1005, and both parties agree that application of Georgia law is appropriate. See Dkt. no. 20 (Defs.' Mot. Summ. J.), pp. 18-19; Dkt. no. 34 (Pl.'s Suppl. Br.), p. 3 n.1.

In Georgia, courts follow a three-step process in examining contracts:

> At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by [the trier of fact].

Eudy v. Universal Wrestling Corp., 611 S.E.2d 770, 773 (Ga. Ct. App. 2005) (quoting Schwartz v. Harris Waste Mgmt. Group, 516 S.E.2d 371, 375 (Ga. Ct. App. 1999)).

AO 72A
(Rev. 8/82)

### a. The Initial Inquiry: Ambiguity

Whether or not a contract is ambiguous is a question of law for the court. See Ga. Code Ann. § 13-2-1. A contract is ambiguous if it contains a "duplicity, indistinctness, [or] an uncertainty of meaning or expression" that makes it susceptible to several reasonable interpretations. Begner, 428 F.3d at 1005 (quoting Holcim (US), Inc. v. AMDG, Inc., 596 S.E.2d 197, 200 (Ga. Ct. App. 2004)).

Here, there are two occurrences in Rayonier's NPDES Permit that the Riverkeeper alleges incorporate Georgia's water quality standards enumerated in Rule 391-3-6-.03(5)(c). The first, which occurs on page one of the Permit, generally references Georgia's water quality control regulations, which include Rule 391-3-6-.03(5). Dkt. no. 20-2, p. 1. The second reference, on page 15 of the permit, mentions Rule 391-3-6-.03(5) generally in the context of "Biomonitoring and Toxicity Reduction Requirements." Id. at Part III, p. 15.

The reference to Georgia's water quality control standards on the first page of the Permit reads:

> In compliance with the provisions of the Georgia Water
> Quality Control Act (Georgia Laws 1964, p. 416, as
> amended), hereinafter called the "State Act," the
> Federal Water Pollution Act, as amended (33 U.S.C.
> 1251 et seq.), hereinafter called the "Federal Act,"
> and the Rules and Regulations promulgated pursuant to
> each of these Acts, Rayonier Jesup Mill . . . is
> authorized to discharge from a facility located at
> [the Mill's address] to the receiving waters Altamaha

> River in accordance with the effluent limitations,
> monitoring requirements and other conditions set forth
> in Parts I, II and III hereof.

Dkt. no. 20-2, p. 1. Stripped down to its necessary and relevant elements, this sentence says: (1) "In compliance with" the CWA, the State Act, and their respective rules and regulations, (2) Rayonier "is authorized" to discharge into the Altamaha River "in accordance with" the conditions set forth in Parts I, II and III of the Permit. This plainly means that Georgia EPD authorized Rayonier's Permit "in compliance" with the Federal and State Acts and their rules, and that Rayonier is authorized to discharge in accordance with the conditions of the Permit.

It does not mean that Rayonier may only discharge in compliance with the Federal and State acts and their attendant rules and regulations. The first clause merely asserts the authority by which the Georgia EPD issues the permit; the second clause asserts that Rayonier is authorized to discharge only in accordance with the conditions enumerated in the Permit. If the Georgia EPD intended the conditions of Rayonier's permit to be coextensive with the water quality standards set forth in the CWA, the State Act, and their rules and regulations, it could have said so by stating "Rayonier is authorized to discharge wastewater into the Altamaha River in accordance with the conditions set forth in Parts I, II and III hereof *and with the*

AO 72A
(Rev. 8/82)

*water quality standards enumerated in the Federal and State Acts
and their attendant regulations."*

The Riverkeeper argues that long-standing precedent from
the Northern District of Georgia holds that this language in a
NPDES permit does, in fact, incorporate Georgia's water quality
standards as conditions of the Permit. True, the court in
Culbertson v. Coats American, Inc., 913 F. Supp. 1572 (N.D. Ga.
1995) held that this exact same language made compliance with
the Georgia water quality standards a NPDES permit requirement
in that case. Id. at 1581. However, Culbertson offers little
guidance to this Court in consideration of this Permit for
several important reasons. First, the defendants in Culbertson
conceded that the provision was intended to make compliance with
the Georgia Rules a permit requirement. Id. Second, by
considering deposition evidence regarding this provision's
intended meaning *before* applying the applicable rules of
contract construction, Culbertson did not follow the same
procedures for interpreting the permit that the Court will
follow here, which allows the Court to consider extrinsic
evidence only *after* determining that the Permit is ambiguous
even in light of the appropriate rules of construction.[1] See
Claussen, 888 F.2d at 749. Third, this decision was never

---

[1] Perhaps because this point was conceded, the court in Culbertson mentioned
this extrinsic evidence to bolster its conclusion. The Court did not discuss
at all the applicable rules of contract construction. See Culbertson, 913 F.
Supp. at 1581.

AO 72A
(Rev. 8/82)

appealed. Thus, while the Court in Culbertson accepted the interpretation that the Riverkeeper urges here, that interpretation has never actually been challenged in court, either in Culbertson or since.

Here, unlike Culbertson, there is no concession before the Court as to what Georgia EPD intended the first page of the permit to mean. Without such a concession, there is no reason for the Court to forego the interpretive process required by statute and common law and skip straight to the Riverkeeper's proffered extrinsic evidence of the Permit's intended meaning. Thus, the clear language on the first page of the Permit is unambiguous, and does not incorporate Georgia's water quality standards as conditions of Rayonier's NPDES Permit.

However, the Permit's second reference to Georgia's water quality standards *is* ambiguous. Under the heading "Biomonitoring and Toxicity Reduction Requirements," Part III of the Permit states: "The Permittee shall comply with effluent standards or prohibitions established by section 307(a) of the Federal Act and with chapter 391-3-6-.03(5) of the State Rules and may not discharge toxic pollutants in concentrations or combinations that are harmful to humans, animals, or aquatic life." This reference to 391-3-6-.03(5) is ambiguous because its context suggests it is strictly concerned with toxic pollutants, but Rule 391-3-6-.03(5) lists a host of water quality standards that

have nothing to do with toxicity. On one hand, a broad reference to Rule 391-3-6-.03(5) would seem to incorporate into the Permit all of the water quality standards throughout that rule. On the other hand, though, the context of that reference suggests that Georgia EPD intended only to incorporate those water quality standards within Rule 391-3-6-.03(5) that concern toxicity. Because this reference to Rule 391-3-6-.03(5) on page 15 of the Permit is open to multiple interpretations, it is inherently ambiguous, and the Court must turn to the applicable rules of contract construction to ascertain its meaning.

### b. Balancing the Applicable Rules of Contract Construction

In addition to the common law rules of construction, Georgia has statutory rules that courts may apply. First and foremost, "[t]he cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." Ga. Code Ann. § 13-2-3. After this primary statutory consideration, Georgia statutory and common law provide several other canons that are helpful in this case. However, "[n]o canon of interpretation is absolute. Each may be overcome by the strength of differing principles that point in other directions." Estate of Pitts v.

City of Atlanta, 746 S.E.2d 698, 702 (Ga. Ct. App. 2013) (citing

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal

Texts 59 (2012)).

### i. The Primary Rule: Intent of the Parties

Here, the Court cannot clearly ascertain, from the four

corners of the Permit, the parties' intent regarding Georgia's

water quality standards. The Riverkeeper argues that the Georgia

EPD's intent in writing Rayonier's Permit (along with all other

NPDES permits in Georgia) "necessarily was to meet the

requirements of the Clean Water Act." Dkt. no. 34, p. 5; see

also 33 U.S.C. § 1251(a) (the purpose of the CWA "is to restore

and maintain the chemical, physical, and biological integrity of

the Nation's waters"); 40 C.F.R. § 122.44(d)(1) (requiring NPDES

permits to include requirements designed to achieve "water

quality standards established under section 303 of the CWA,

including State narrative criteria for water quality"). However,

this supposed intent is undermined by another provision in the

Permit. Looking solely to the Permit itself, it is apparent that

the Georgia EPD did not believe that the Permit, as written,

would necessarily include conditions designed to achieve water

quality standards established under the CWA and Georgia

Regulations. If it had, it would not have included a clause

stating: "Nothing in this permit shall be construed to preclude

the modification of any condition of this permit when it is

AO 72A
(Rev. 8/82)

determined that the effluent limitations specified herein fail to achieve the applicable State water quality standards." Dkt. no. 20-2, Permit Part II.B.8, p. 14. This provision means nothing if it does not contemplate the possibility that the Permit's conditions do not, in fact, incorporate all of Georgia's water quality standards as conditions of the permit.

The Riverkeeper encourages this Court to look beyond the Permit itself and focus on the CWA's purpose and statutory scheme to determine Georgia EPD's intent under Georgia Code section 13-2-3's intent analysis. This suggested approach will not align the Court's interpretation of the Permit with the Riverkeeper's for three reasons. First, it requires the Court to look outside of the Permit to determine Georgia EPD's intent. Even if statutory purposes and permitting schemes are not "extrinsic evidence" in the traditional sense, Georgia's rules of construction plainly favor evidence from within a document itself over outside evidence. See, e.g., Eudy, 611 S.E.2d at 773 (noting that, at least initially, "the contract alone is looked to for its meaning.").

Second, even if the Court were to consider the CWA's statutory purpose and permitting schemes, other aspects of the CWA militate against a finding that a permitting authority necessarily intended a permit to effectuate all of the standards found in the CWA and state regulations. Such a holding would

eviscerate the "permit shield" contemplated under 33 U.S.C. § 1342(k) ("Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title with sections 1311, 1312, 1316, 1317, and 1343 of this title . . ."). See also Black Warrior, 734 F.3d at 1301 (§ 1342(k)'s permit shield "affords an absolute defense to a permit holder that complies with the conditions of its permit against citizen suits" seeking to enforce certain provisions of the CWA).

Finally, even if the Court were to find that Georgia EPD intended to make Rayonier's permit conditions coextensive with the water quality standards found in the CWA and Georgia's Rules, Georgia Code section 13-2-3 requires Georgia EPD to use "sufficient words . . . to arrive at the intention" in the Permit itself. Ga. Code Ann. § 13-2-3. As discussed above, neither reference to Rule 391-3-6-.03(5) clearly indicates that the permit intends to incorporate the narrative water quality standards found in that rule.

### ii. Georgia's Statutory Rules of Construction

Having looked first to evidence of Georgia EPD's intent within the Permit itself, the Court now turns to Georgia's statutory rules of construction found in Georgia Code section 13-2-2. While many of these canons are not helpful in this case, a few are.

AO 72A
(Rev. 8/82)

Georgia Code section 13-2-2(4) provides that "the construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." As discussed above, the Riverkeeper's proffered interpretation of the Permit would render the "Permit Modification" provision found in Part II.B.8 of the permit meaningless. This statutory rule of construction, then, tilts in Rayonier's favor.

Additionally, Georgia Code § 13-2-2(5) provides that "[i]f the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." The Georgia Supreme Court has interpreted this provision to mean that a contract should "be construed against the preparer and in favor of the non-preparer." Hertz Equip. Rental Corp. v. Evans, 397 S.E.2d 692, 694 (Ga. 1990); see also Reichman v. S. Ear, Nose & Throat Surgeons, P.C., 598 S.E.2d 12, 16 (Ga. Ct. App. 2004) ("Pursuant to [Ga. Code Ann.] § 13-2-2(5) as judicially interpreted, where the construction of a contract is doubtful, the construction that goes most strongly against the drafter of the agreement is to be preferred."). Here, the Riverkeeper "stands in the shoes" of Georgia EPD, who drafted the Permit. Pub. Interest Research Grp. of N.J., 913 F.2d at 74. As such, it will be considered the drafter for purposes of applying this statutory rule of

AO 72A
(Rev. 8/82)

construction, as judicially interpreted. Because Georgia EPD drafted the relevant provisions and issued the permit, any ambiguity as to whether the Georgia water quality standards are incorporated should be construed against the Riverkeeper. This rule of construction also tilts in Rayonier's favor.

Finally, while many of the canons of construction the Court has discussed thus far lean in Rayonier's favor, the Court is nevertheless concerned with the fact that ruling in Rayonier's favor will necessarily require the Court to interpret Part III's reference to Rule 391-3-6-.03(5) as referring specifically—and only—to Rule 391-3-6.03(5)(e). To that end, the Riverkeeper urges that the Court should not "add terms or provisions to the contract. In construing a contract, 'courts cannot insert what has been omitted or rewrite a contract made by the parties." Pl.'s Supp. Br. pp. 7-8 (quoting Seitzinger v. Comm. Health Network, 676 N.W.2d 426, 441 (Wis. 2004)). However, despite its intuitive appeal, this rule of interpretation (which is presented here from the dissenting opinion of another state's supreme court) contradicts, at least partly, one of Georgia's statutory rules of interpretation: "The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other. In extreme cases of

AO 72A
(Rev. 8/82)

ambiguity, where the instrument as it stands is without meaning, words may be supplied." Ga. Code Ann. § 13-2-2(6).

This provision appears to be concerned primarily with grammatical errors and omitted terms. The Court is not convinced that Part III's "Biomonitoring and Toxicity Reduction Requirements" section, or the Permit as a whole, "stands without meaning" if "(e)" is not supplied after the reference to Rule 391-3-6-.03(5). However, the Court need not actually supply an "(e)" to interpret the reference to Rule 391-3-6-.03(5) narrowly in light of its section heading. Furthermore, by Rayonier's own admission, Georgia Code section 13-2-2(6) is not a rule that can properly be applied in this case. Thus, on balance, the Riverkeeper's proffered rule against inserting terms does not appear to be binding or instructive to this Court, but at the same time Georgia Code section 13-2-2(6) also appears to be a poor fit. Despite the parties' briefing on this matter, the Court does not find that Georgia Code section 13-2-2(6) or related rules of construction help clarify the Permit's terms.

### iii. Non-Statutory Rules of Construction

The rules of construction found in Georgia Code section 13-2-2 are not exhaustive. <u>See</u> Ga. Code Ann. § 13-2-2 ("The following rules, *among others*, shall be used in arriving at the true interpretation of contracts") (emphasis added). Here, the

AO 72A
(Rev. 8/82)

Court finds that the common law rule that courts interpret contract provisions in light of their headings is instructive.

Rayonier argues that the reference to Georgia Rule 391-3-6-.03(5) in the Permit's "Biomonitoring and Toxicity Reduction Requirements" section must be construed in light of that heading. Dkt. no. 35, p. 17. The Riverkeeper urges that Rayonier's argument has been "flatly rejected by Georgia courts." Georgia courts' position on this matter is not as clear as the Riverkeeper suggests. The Riverkeeper cites Suggs v. Brotherhood of Locomotive Firemen & Enginemen, 127 S.E.2d 827 (Ga. Ct. App. 1962), in support of its argument that the court should disregard the heading in Part III of the Permit. See id. at 829 ("The title, not being in truth a part of the article, cannot be used to throw light on or to vary the unambiguous language of the body of the contract.").

The Southern District of Georgia has had occasion to examine Suggs once before in Chatham Area Transit Authority v. First Transit, Inc., No. CV 406-282, 2009 WL 2135809 (S.D. Ga. July 15, 2009), which held that "Suggs holds only that the title of a provision cannot override the text in its body." Id. at *2. Furthermore, Chatham Area Trans. Auth. concluded that "a limited application of Suggs is consistent with Georgia courts' repeated use of titles when construing contracts since Suggs." Id. (citing Donchi, Inc. v. Robdol, LLC, 640 S.E.2d 719, 722 (Ga.

20

Ct. App. 2007) ("[T]he language of paragraph 16, as well as its heading, evidences the intent of the parties involved.");

Authentic Architectural Millworks, Inc. v. SCM Grp. USA, Inc., 586 S.E.2d 726, 730 (Ga. Ct. App. 2003) (finding that a clause textually dissimilar to a merger clause and titled "limited warranty" was not a merger clause); Giles v. Nationwide Mut. Fire Ins. Co., 405 S.E.2d 112, 114 (Ga. Ct. App. 1991) ("[T]he word 'action' must be read together with the clause heading.")). The Court in Chatham Area Transit then read a contract provision in that case along with its title to find the parties' intention. Chatham Area Transit, 2009 WL 2135809 at *2.

And in this case, the Court will follow suit with Chatham Area Transit and the several Georgia Courts of Appeals decisions since Suggs and interpret the reference in Part III to Georgia's water quality standards in light of its heading. The first paragraph under the "Biomonitoring and Toxicity Reduction Requirements" heading reads: "The Permittee shall comply with effluent standards or prohibitions established by section 307(a) of the Federal Act and with chapter 391-3-6-.03(5) of the State Rules and may not discharge toxic pollutants in concentrations or combinations that are harmful to humans, animals, or aquatic life."

While a reference to Rule 391-3-6-.03(5) would appear to include Rule 391-3-6-.03(5)(c) (as well as subsections (a), (b),

(d), (e), (f), and (g)), only subsection (e) actually concerns toxicity. Furthermore, subsection (e)'s language tracks that of Part III.C's opening paragraph: "All waters shall be free from toxic, corrosive, acidic and caustic substances discharged from municipalities, industries, and other sources, such as nonpoint sources, in amounts, *concentrations or combinations which are harmful to humans, animals or aquatic life.*" Ga. Comp. R. & Regs. 391-3-6-.03(5)(e) (emphasis added). In light of such strong indications that Part III.C is singularly concerned with enforcing toxicity standards, this Court has little difficulty in looking to that Part's heading and the subsequent language to determine that Georgia EPD intended to refer to Rule 391-3-6-.03(5)(e) when it referred to Rule 391-3-6-.03(5) generally.

The Riverkeeper has provided two other non-statutory rules of construction in support of its interpretation of the Permit. First, the Riverkeeper argues that contracts should not be interpreted in such a way as to render them illegal. The Supreme Court has held that "[s]ince a general rule of construction presumes the legality and enforceability of contracts . . . ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." Walsh v. Schlecht, 429 U.S. 401, 408 (1977). However, adopting Rayonier's preferred interpretation will not

render the Permit illegal or unenforceable. The Permit may still be enforced up to its enumerated terms. True, the Permit does not live up to the requirements of the CWA as written, but this fault of Georgia EPD's does not render the permit as written illegal or unenforceable. In fact, the Permit itself provides a way to rectify this shortcoming in its "Modification Clause," which allows the Georgia EPD to modify the Permit's conditions if they fail to achieve the applicable Georgia water quality standards. Dkt. no. 20-2, Permit Part II.B.8, p. 14.

Second, the Riverkeeper suggests that courts should favor a construction in the public interest where a contract dispute is of public concern. This is a "rule of construction rather than one of interpretation, one that for reasons of public policy requires the court to give to a contract that legal operation that is of public advantage, when a choice between that and a less advantageous operation is reasonably open." Nw. Envtl. Advocates v. City of Portland, 56 F.3d 979, 985 (9th Cir. 1995) (quoting Corbin, *Contracts*, § 550 at 196 (1960)). Here, taking Plaintiff's allegations as to the effects of Rayonier's wastewater discharge as true, it would certainly appear that the public does have an interest in protecting the integrity of the Altamaha River. However, the public may also have an interest in ensuring that businesses and industries are given explicit notice of what kinds of discharges will violate their NPDES

AO 72A
(Rev. 8/82)

permits before subjecting them to onerous civil penalties. The Court could delve further into this question of public policy, but that is not necessary here. As stated in Northwest Environmental, this rule of construction is operative only when "a choice between" the public's preferred interpretation and an alternative interpretation "is reasonably open." Id. As the preceding portions of this Order have shown, though, the available rules of interpretation do not present two equally plausible interpretations. To the contrary, they have strongly favored Rayonier's interpretation. If the Court were in need of a tie-breaker, this rule of construction may have been helpful, but it does not outweigh the bulk of the others discussed above.

Thus, the majority of the rules of construction discussed in this Order weigh in favor of Rayonier's interpretation of the Permit. In light of these rules, the Court finds that the ambiguity in the Permit's meaning is now sufficiently clarified, and the Court need not turn to the Riverkeeper's proffered extrinsic evidence of Georgia EPD's intended meaning. See Claussen, 888 F.2d at 749 (citing Holcomb, 238 S.E.2d at 916 (Ga. 1977)) (noting that courts turn to extrinsic evidence to explain ambiguity in a contract "only when a contract remains ambiguous after the pertinent rules of construction have been applied."). As a matter of law, then, the Permit does not incorporate Georgia's water quality standards enumerated in Rule

AO 72A
(Rev. 8/82)

391-3-6-.03(5)(c) as conditions of the Permit. Without an alleged violation of a condition of Rayonier's permit, the Riverkeeper no longer has a basis for its CWA citizen suit, and the Court must **GRANT** Rayonier's motion for summary judgment (Dkt. no. 19) as to the Riverkeeper's CWA claims (Counts I, II, V (Injunctive Relief), and VII).

The Court does not intend this holding to suggest that Rayonier's discharges do not have a harmful effect on the Altamaha River, or that the Riverkeeper's alleged injuries are trivial. To the contrary, those effects may be deleterious, and Rayonier's discharges may, in fact, violate Georgia's narrative water quality standards. The Court's holding is simply that the Riverkeeper must show a violation of Rayonier's NPDES Permit to bring its CWA citizen suit, and here it failed to show that compliance with the relevant water quality standards is a condition of Rayonier's NPDES Permit.

Furthermore, while the Riverkeeper's CWA claim will not go forward, the Riverkeeper is not without recourse. Under the Permit's "Modification Clause," the Riverkeeper may ask Georgia EPD to modify the Permit so that it explicitly incorporates Rule 391-3-6-.03(5)(c)'s narrative water quality standards as conditions of the permit. If it is now, in fact, Georgia EPD's intent for these water quality standards to be incorporated as conditions of Rayonier's Permit, then this Order likely

AO 72A
(Rev. 8/82)

satisfies any precondition required for such a modification. <u>See</u>
Dkt. no. 20-2, Permit Part II.B.8, p. 14 ("Nothing in this
permit shall be construed to preclude the modification of any
condition of this permit *when it is determined that the effluent*
*limitations specified herein fail to achieve the applicable*
*State water quality standards.*") (emphasis added).

### III. The Riverkeeper's State Law Claims

In addition to its CWA claims, the Riverkeeper brings state
law claims for negligence (Count III), negligence per se (Count
IV), public nuisance (Count V), and attorney's fees under
Georgia Code section 13-2-11 (Count VI). Because both parties
have requested that the state law claims be dismissed or
remanded to state court if the Court grants summary judgment on
the CWA claims, the Riverkeeper's state law claims are dismissed
without prejudice pursuant to 28 U.S.C. § 1367(c)(3). <u>See</u> Def.'s
Mot. Summ. J. p. 35; Dkt. no. 29 (Pl.'s Resp.), p. 30; <u>see also</u>
<u>Raney v. Allstate Ins. Co.</u>, 370 F.3d 1086, 1089 ("We have
encouraged district courts to dismiss any remaining state claims
when, as here, the federal claims have been dismissed prior to
trial.").

### CONCLUSION

Compliance with Georgia's narrative water quality standards
found in Rule 391-3-6.03(5)(c) is not a condition of Rayonier's
NPDES permit. As such, failure to comply with those standards

AO 72A
(Rev. 8/82)

cannot be the basis for a citizen suit against Rayonier under 33
U.S.C. § 1356. Defendant Rayonier's motion for summary judgment
(Dkt. no. 19) is **GRANTED** as to the Riverkeeper's Clean Water Act
claims (Counts I, II, V (Injunctive Relief), and VII). The
Riverkeeper's state law claims (Counts III, IV, V (Public
Nuisance) and VI) are **DISMISSED** without prejudice. The Clerk of
Court is directed to enter the appropriate judgment.

     **SO ORDERED**, this 31ST day of March, 2015.


LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)